UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

LOUDESIA FLANAGAN,

        Plaintiff,

    v.

CITY OF RICHMOND, *et al.*,

        Defendants.

Case No.  14-cv-02714-EMC

**ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

(Docket Nos. 39, 46, 55)

## I.    INTRODUCTION

Plaintiff Loudesia Flanagan filed this lawsuit against Defendants City of Richmond and Police Chief Christopher Magnus, alleging that Defendants wrongfully terminated her employment out of religious discrimination and in retaliation for making workplace complaints. Docket No. 1 (Compl.) ¶¶ 36, 43, 49.  Plaintiff also alleges that the termination process violated her due process rights.  Compl. ¶ 35.

Defendants' motion for summary judgment came on for hearing before the Court on September 24, 2015.  For the reasons set forth below, the Court **GRANTS** Defendants' motion for summary judgment.

## II.    BACKGROUND

A.    <u>Plaintiff's Employment with the Richmond Police Department</u>

Starting in 1989, Plaintiff was employed by the City of Richmond as a Police Records Specialist (PRS), until the termination of her employment in October 2013.  Docket No. 39-2 (Flanagan Dep.) at 40:11-12, 45:3-14.  Plaintiff was terminated based on the following charges: (1) discourteous and disrespectful treatment of a volunteer intern, Ms. Sequoia Taylor; (2) inappropriate comments and conduct regarding homosexuality; and (3) dishonesty during the administrative interview.  Flanagan Dep., Exh. V at 2-3.

Prior to her termination, Plaintiff had received positive performance evaluations.  In her

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

September 1999 performance evaluation, Plaintiff received "Above Standard" marks in five out of six categories. Flanagan Dec. at Exh. B. In her September 2005 performance evaluation, Plaintiff received "Standard" marks - the highest rating - in five out of six categories. Flanagan Dec. at Exh. C. No performance evaluations were conducted since, but in 2011, a draft evaluation gave Plaintiff "Standard" marks in most categories, but noted that Plaintiff's "conversations with co-workers and other department personnel were arduous at times," and that while she "had pragmatic ideas[,] your methods of bringing them about may not have been appropriate, or yielded the desired results. (i.e. consulting other supervisors outside your chain of command.)" Docket No. 51 (Poore Dec.), at Exh. E. On July 19, 2012, Plaintiff received a positive e-mail from Police Chief Magnus, forwarding a citizen letter praising the Richmond Police Department, including Plaintiff. Flanagan Dec. at Exh. D.

At the same time, Plaintiff's employment was marked by disciplinary actions and complaints. On September 16, 2004, December 27, 2004, and January 5, 2005, Plaintiff received separate reprimands for leaving work without permission, failing to follow sick leave reporting procedures, and insubordination. Flanagan Dep., Exhs. A-C. In July 2006, Plaintiff received a three-month pay reduction for making false and misleading statements to a supervisor. *Id.*, Exhs. D-F.

On May 16, 2008, Plaintiff filed a formal letter of complaint against Lieutenant Enos Johnson, contending that Lieutenant Enos had instructed someone to open her locker and "seize" a spiritual scripture that was taped inside her locker. Flanagan Dec. at Exh. E. The scripture in question read: "RPD, you meant it for evil, but God meant it for good and blessed it so that I may be a blessing." Flanagan Dep. at 292:20-23. The scripture was a reference to the Biblical story of Joseph and his brothers, and how Joseph prospered despite the wrongs that his brother had done to him. *Id.* at 294:11-25. By adding "RPD," Plaintiff meant to equate the Richmond Police Department to Joseph's brothers. *Id.* at 293:1-5, 14-20, 295:17-18. A subsequent Human Resources Investigation found that a female sergeant had approached Lieutenant Johnson, reporting that she found an open locker which was empty except for a handwritten note taped to

2

United States District Court
For the Northern District of California

the door, the content of which the sergeant found "disturbing."  Docket No. 49-1 (Magnus Dep.), Exh. 4.  Lieutenant Johnson asked the sergeant to bring him the note.  *Id.*  The following day, Plaintiff approached Lieutenant Johnson wanting to know who had searched the locker, to which Lieutenant Johnson replied that the locker was not searched but had been found open.  *Id.*  The note was returned to Plaintiff.  *Id.*  The investigation observed that Plaintiff was not told that she could not display the scripture in her locker, and concluded that there was no violation of her constitutional rights.  *Id.*

On December 7 or 8, 2011, Plaintiff filed a formal letter of complaint against Records Supervisor Lisa Everett, alleging harassment.  Flanagan Dep., Exh. L.  The complaint stemmed from a December 5, 2011 incident, in which Plaintiff wore a Santa hat while on-duty.  *Id.*  That day, Supervisor Everett informed Plaintiff multiple times that she could not wear the hat, as the hat would only be permitted on Christmas Eve and Christmas Day.  *Id.*  However, Plaintiff refused to remove the hat, and ignored Supervisor Everett's attempts to speak to her about the hat.  *Id.*  The following day, Supervisor Everett and Plaintiff confronted each other, during which Plaintiff accused Supervisor Everett of harassing her.  *Id.*  When the Santa hat incident was subsequently investigated, the investigator recommended sustaining allegations of insubordination and violation of uniform requirements against Plaintiff.  *Id.*

Finally, in December 2012, Plaintiff was suspended for two days without pay.  *Id.*, Exh. I.  The charges were three incidents in which Plaintiff used disparaging and offensive language on May 3, May 4, and September 6, 2012.  *Id*, Exh. J.  Plaintiff appealed the suspension to arbitration, and the arbitrator found that Plaintiff's "account of what transpired lacks credibility.  Plaintiff consistently attempted to justify or deny what she said or meant, while attacking the accusing witnesses as liars."  *Id.*  The arbitrator concluded that there was just cause for Plaintiff's two-day suspension.  *Id.*

B.   Plaintiff's October 2013 Termination

In early 2012, Ms. Taylor became a volunteer with the Richmond Police Department.  Docket No. 39-14 (Milam Dec.) at Exh. A.  In approximately March 2012, Ms. Taylor notified

Volunteer Coordinator Michelle Milam that the PRS were not acknowledging her or allowing her into the secured areas, specifically identifying Plaintiff.  Milam Dec. at ¶ 4.  Although Volunteer Coordinator Milam sent an e-mail to the Records Unit reminding them to allow volunteers access into the building, in June 2012, Ms. Taylor again reported that she was having trouble being admitted into the building by Plaintiff.  *Id.* at ¶¶ 5-6.  Volunteer Coordinator Milam then spoke to Supervisor Everett, informing her of Ms. Taylor's complaint and asking her to counsel Plaintiff about Ms. Taylor's right of access.  *Id.* at ¶ 7.  Volunteer Coordinator Milam subsequently e-mailed Ms. Taylor, assuring her that corrective action was taken and to let her know if there were further access issues with Plaintiff.  *Id.* at ¶ 7, Exh. C.  Plaintiff denies that she was ever counseled for failing to buzz in volunteers in 2012.  Flanagan Dec. at ¶ 21.

On April 18, 2013, an incident occurred between Ms. Taylor and Plaintiff.  Defendants assert that Ms. Taylor was with another volunteer intern, Ms. Lorena Hernandez, and that upon Plaintiff granting them access, the following comments were exchanged:

> Taylor:     Oh, I'm shocked you let me in.
>
> Plaintiff:  I didn't even see you out there… but had I known it was you, I probably wouldn't have opened the door anyway.

Docket No. 39-6 (Investigative Report) at 14.[1]

Following this incident, Ms. Taylor went to Ms. Vickie Riggins, the Executive Secretary for Police Chief Magnus.  *Id.* at 13.  Ms. Taylor allegedly told Ms. Riggins about her frustrations with Plaintiff, including the April 18 exchange and that Plaintiff "had unnecessarily and purposely

---

[1] Plaintiff objects to the Investigative Report on hearsay grounds.  Docket No. 54 (Objections) at 2-3.  Yet, Plaintiff also asserts that the Investigative Report can be used by Plaintiff as admissions against Defendants.  Objections at 3, n. 3.  Defendants respond that the Investigative Report is not offered for the truth of the matters asserted, but to show the state of mind of the decision-makers who recommended termination.  Docket No. 58 (Reply) at 9.  The Court therefore overrules Plaintiff's objection, but limits its citations of the Investigative Report to Plaintiff's citations, Plaintiff's witness statement per Federal Rule of Evidence 801(d)(2), and to the extent necessary the entirety of the Report to show its effect on the minds of the decision-makers who recommended termination.

4

made her wait in the lobby or just completely ignored her." *Id.* Ms. Taylor purportedly attributed Plaintiff's dislike of her to the fact that Ms. Taylor is a lesbian. *Id.*; see also Docket No. 49-2 (Curran Dep.) at 32:12-20.

Ms. Riggins informed Lieutenant Lori Curran about her conversation with Ms. Taylor. Curran Dep. at 32:20. Lieutenant Curran then notified Deputy Chief Ed Medina, who informed her that he would speak to Chief Magnus about what to do. *Id.* at 32:21-23. After speaking to Chief Magnus, Deputy Chief Medina told Lieutenant Curran to have the unit, Lieutenant Curran, or Records Supervisor Michael Schlemmer conduct an investigation. *Id.* at 32:23-33:1. Lieutenant Curran chose to act as the investigator, and had Records Supervisor Schlemmer assist, including conducting witness interviews. *Id.* at 34:4-9, 35:14-21. On May 9, 2013, Plaintiff was placed on administrative leave with pay, "pending further investigation of misconduct against a police department volunteer which occurred on April 18, 2013. The allegations included **Discrimination** and **Conduct Unbecoming** a Police Records Specialist." Flanagan Dep., Exh. R. (bold in original). Plaintiff has confirmed that she understood that she was being investigated for the April 18, 2013 incident with Ms. Taylor. Flanagan Dep. at 134:13-16.

Prior to the investigation, Plaintiff had brought a complaint against Lieutenant Curran in December 2012 for calling her at home and yelling at her in front of her children. Flanagan Dec. at ¶ 12. The complaint stated that Lieutenant Curran had called Plaintiff at home, "falsely accus[ing] her of leaving the Records section below minimum staffing." Flanagan Dec. at Exh. F. Plaintiff had replied that she thought that as long as there was one clerk on duty, that was sufficient. *Id.* She then asked why had she been "scolded and talked to as if I were a child," and that the "situation/work option had been afforded to others. Why the disparity?" *Id.*

After the investigation started, on May 21, 2013, Plaintiff brought a complaint against Records Supervisor Schlemmer, accusing her of showing "bias and hostility" during the investigation and that "[t]he response of Supervisor Michael S. and the Administration of allegations made against me are racially motivated." Flanagan Dec. at Exh. H. A December 2013 investigation into Plaintiff's allegations against Records Supervisor Schlemmer and Lieutenant

United States District Court
For the Northern District of California

Curran "failed to produce any evidence that the conduct which Ms. Flanagan complaints was racially motivated."  Curran Dep., Exh. 4 at 2.

The investigation into the April 18, 2013 incident involved interviews with seventeen witnesses, including Plaintiff.  Investigative Report at 3.  Most of the witnesses were unaware of any disparaging comments by Plaintiff, but several recalled comments made by Plaintiff about Ms. Taylor or homosexuality in general.  *Id.* at 4-17.  For example, PRS Danette Aberson reported overhearing Plaintiff ask others if they thought Ms. Taylor was a lesbian, and when this was affirmed, commented that "she won't be going to heaven then because God does not like gays." *Id.* at 8.  Former PRS Saeda Drake also reported that she had personally heard Plaintiff inquiring about which bathroom Ms. Taylor used, and making multiple comments such as "[Chief] Magnus is cultivating a gay environment" and "God made Adam and Eve, not Adam and Steve."  *Id.* at 11. She also stated that she alerted Volunteer Coordinator Milam that Plaintiff was biased towards Ms. Taylor because she was a lesbian.  *Id.*  PRS Harper and PRS Chandra Bryant also stated that they were aware of Plaintiff's negative views towards homosexuals.  *Id.* at 7, 9.

During her interview, Plaintiff asserted that she did not recall making the homophobic comments reported by her colleagues.  *Id.* at 15.  With respect to the incident with Ms. Taylor, Plaintiff "admitted to being rude toward TAYLOR but justified it by saying that it was TAYLOR who was initially rude to her."  *Id.* at 14.  Plaintiff also states that during her interview, she informed Lieutenant Curran that she thought it was unfair for Lieutenant Curran to conduct the investigation when Plaintiff had made a complaint against her.  Flanagan Dep. at 141:22-142:2.

Based on the investigation, Lieutenant Curran's report determined that: (1) Plaintiff was discourteous and disrespectful to Ms. Taylor on April 18, 2013, (2) Plaintiff created a hostile work environment by speaking openly about her dislike for and bias towards homosexuals, and (3) Plaintiff was untruthful during her interview when she denied making discriminatory comments. *Id.* at 19-22.  Deputy Chief Medina referred the report to Captain Anthony Williams, who reviewed the investigation and formulated a disciplinary recommendation.  Docket No. 39-13 (Medina Dec.) at ¶ 8.  On September 30, 2013, Captain Williams recommended that Plaintiff be

United States District Court
For the Northern District of California

terminated from employment.  *Id.* at Exh. C.  Deputy Chief Medina concurred in the

recommendation, informed Chief Magnus of the recommendation, and sent the case to Human

Resources to prepare a formal notice of discipline.  *Id.* at ¶ 8.

Plaintiff received her Skelly Notice on October 9, 2013, informing her of the City's

proposal to terminate her employment.[2]  Flanagan Dep., Exh. V at 1.  The proposed termination

was based on three charges: (1) discourteous and disrespectful treatment of a volunteer intern

based on the April 18, 2013 event, (2) inappropriate comments and conduct regarding

homosexuality, and (3) dishonesty during the administrative interview.  *Id.* at 2-4.  The Skelly

Notice also cited Plaintiff's prior disciplinary actions.  *Id.* at 5.  Plaintiff was notified of her right

to respond either orally and/or in writing, and how to schedule a Skelly hearing.  *Id.* at 5.  The

Skelly Notice included a CD with the Investigative Report and all recorded interviews, which

Plaintiff had the chance to review before the Skelly hearing.  Flanagan Dep. at 191:5-192:2.

Plaintiff requested a Skelly hearing, which was held before Chief Magnus on October 25,

2013.  Flanagan Dep., Exh W.  Plaintiff was accompanied by her union representatives.  *Id.*

Plaintiff contends that Chief Magnus should not have acted as the Skelly officer because she had

made a complaint against him in February 2013.  Flanagan Dec. at ¶ 17; *see also* Medina Dec.,

Exh. B.  In this e-mail to Deputy Chief Medina, Plaintiff expressed her fear of returning to the

"enemy's camp" following a vacation.  After praising Deputy Chief Medina, Plaintiff noted that

she "ha[s] no faith in our chief's ability to be right and fair."  Medina Dec., Exh. B.  Plaintiff does

not recall if she made her concerns about Chief Magnus's potential bias known, except possibly to

her union representatives.  Flanagan Dep. at 171:18-24, 172:14-21.

Following the Skelly hearing, Chief Magnus recommended that Plaintiff's employment be

---

[2] The Skelly notice and hearing provisions are derived from the California Supreme Court decision, *Skelly v. State Personnel Board*, 15 Cal. 3d 194 (1975), which "recognize[d] a public employee's right to a pre-termination hearing."  *Walls v. Cent. Contra Costa Transit Auth.*, 653 F.3d 963, 968 (9th Cir. 2011).  "At a minimum, these pre-removal safeguards must include notice of the proposed action, the reasons therefor, a copy of the charges and materials upon which the action is based, and the right to respond, either orally or in writing, to the authority initially imposing discipline."  *Id.* (citations omitted).

**United States District Court**
For the Northern District of California

terminated.  Magnus Dep., Exh. 6 at 1.  In making his recommendation, Chief Magnus raised concerns that "based on her repeated and unflinching willingness to call her colleagues dishonest in this case, [Plaintiff] can no longer be trusted by her co-workers if she were to retain her position as Police Records Specialist." *Id.* at 7.  On October 29, 2013, Plaintiff's employment was terminated, and a copy of the termination letter placed in her official personnel file in the Human Resources Department.  Flanagan Dep., Exh. W.

The termination letter informed Plaintiff of her two options to appeal.  First, Plaintiff could appeal her termination to the City's Personnel Board, which would involve an adjudicatory hearing that included the right to present and cross-examine witnesses, be represented by counsel, obtain a transcript, and be issued written findings and recommendations.  The City Council then had the authority to uphold or reject the Personnel Board's recommendation.  Docket No. 39-10 (Stephenson Dec.) at ¶ 4.  Second, Plaintiff could appeal her termination in binding arbitration.  The union and City would jointly select a neutral arbitrator, who would hold a hearing and render a final decision.  *Id.* at ¶ 5.

Plaintiff demanded binding arbitration, and a neutral arbitrator was jointly selected.  *Id.* at Exh. G.  Although binding arbitration was scheduled, on August 21, 2014, the union informed the arbitrator that Plaintiff had decided not to go arbitration, but to instead file the instant action.  *Id.* at Exh. I; *see also* Flanagan Dep. at 207:17-208:2.

## III.   DISCUSSION

### A.   Procedural Motions

In connection with her opposition to the instant motion for summary judgment, Plaintiff filed an administrative motion for a page extension and evidentiary objection.  As Defendants correctly point out, both were filed in flagrant disregard of the local rules.  However, because this is a dispositive motion, Plaintiff's administrative motion for a page extension is granted.

As to the evidentiary objections, Plaintiff's objection to paragraph 7 of the Stephenson Declaration is sustained for lack of personal knowledge.  Plaintiff's objection to paragraph 6 of the Medina Declaration, which states "a[n] unpleasant conflict between PRS Flanagan and Taylor

1   over access was reported to me," is sustained to the extent the statement is offered for its truth.

2   However, like the Investigative Report, it is admissible for its effect on the listener.  Defendants'

3   objection to paragraph 8 of the Flanagan Declaration is sustained for lack of personal knowledge,

4   as Plaintiff attempts to testify as to the knowledge of other people without providing a basis for

5   her knowledge.  Finally, Defendants' objection to paragraph 19 of the Flanagan Declaration is

6   sustained for lack of foundation, as Plaintiff has no basis for her conclusion that Defendants'

7   failure to appear before the Appeals Board was because they knew their case lacked merit.  All

8   other objections are overruled.[3]

9   B.   Plaintiff's Ex Parte Application

10      Plaintiff brought an ex parte application to deny Defendants' motion for summary

11  judgment pursuant to Federal Rule of Civil Procedure 56(d).  Docket No. 46 (Ex Parte

12  Application).  Like the evidentiary objections, this ex parte application is not procedurally proper.

13  Local Rule 7-10 permits the filing of an ex parte motion "only if a statute, Federal Rule, local rule

14  or Standing Order authorizes the filing of an ex parte motion in the circumstances . . . . The motion

15  must include a citation to the statute, rule or order which permits the use of an *ex parte* motion to

16  obtain the relief sought."  Plaintiff makes no such citation.  Instead, Plaintiff cites to Federal Rule

17  of Civil Procedure 56(d) and Local Rules 6-1 and 6-3.  Ex Parte Application at 2.  Federal Rule

18  56(d) makes no reference to ex parte applications, while Local Rules 6-1 and 6-3 concern motions

19  to change time.[4]  Plaintiff's ex parte application appears to be an attempt to avoid the page limits.

20      In any case, Plaintiff's ex parte application lacks evidentiary support.  Federal Rule of

21  Civil Procedure 56(d) permits the court to defer consideration of a summary judgment motion "[i]f

22  a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts

23  essential to justify its opposition . . . ."  In such a case, "[t]he burden is on the party seeking

24  additional discovery to proffer sufficient facts to show that the evidence sought exists . . . and that

25

26  [3] Although overruled, the Court did not rely upon the objected to material in its ruling on this case.

27  [4] Even if Local Rule 6-3 applied, Plaintiff's ex parte application would be in violation as Local
    Rule 6-3 limits the motion to enlarge or shorten time to "no more than 5 pages in length."

28                                                          9

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

it would prevent summary judgment." *Nidds v. Schindler Elevator Corp.*, 113 F.3d 912, 921 (9th Cir. 1996).  To satisfy this burden, there must be a "basis or factual support that further discovery would lead to the facts and testimony . . . described in [the] affidavit." *Margolis v. Ryan*, 140 F.3d 850, 854 (9th Cir. 1998) (finding that the burden was not satisfied where "a review of the record leads to the conclusion that Margolis' affidavit is based on nothing more than wild speculation.").

Here, Plaintiff's application is based on her inability to depose Ms. Taylor, whose complaint led to the investigation of Plaintiff.  Plaintiff asserts that Ms. Taylor is a key witness, and that her testimony could show that she made no complaints of discrimination or harassment by Plaintiff.  Ex Parte Application at 7.  Plaintiff also suggests that Ms. Taylor will testify that she only complained in early 2012, not in April 2013, when the incident leading to the investigation of Plaintiff occurred.  *Id.*  This would support Plaintiff's theory that Defendants "revived" Ms. Taylor's 2012 complaint only after Plaintiff made complaints about Lieutenant Curran and Captain Magnus in December 2012 and February 2013.  *Id.* at 7-8.  Finally, Plaintiff argues that Ms. Taylor could testify that she made complaints about other PRS not buzzing her in, which Defendants did not investigate.  *Id.* at 8.

Plaintiff's argument that Ms. Taylor will corroborate her theories seems speculative at best.  Plaintiff provides no evidence that Ms. Taylor will testify to any of this.  Instead, the record shows that Ms. Taylor made complaints specifically about Plaintiff.  Volunteer Coordinator Milam states that Ms. Taylor specifically identified Plaintiff in her 2012 complaints about denied access to secured areas.  Milam Dec. at ¶ 4.  Portions of the Investigative Report cited by Plaintiff also show that Ms. Taylor was specifically upset about Plaintiff's behavior during the April 18, 2013 interaction, and had complained to Ms. Riggins that Plaintiff "had unnecessarily and purposely made her wait in the lobby or just completely ignored her."  Investigative Report at 13.  Furthermore, the investigation into Plaintiff was not related to her failure to allow Ms. Taylor in, but her allegedly rude behavior towards Ms. Taylor on April 18, 2013, when she did in fact let Ms. Taylor in.  Flanagan Dep., Exh. V.  Because Plaintiff has failed to satisfy her burden of showing that there is a basis for deferring consideration of this motion to allow the deposition of Ms.

United States District Court
For the Northern District of California

1    Taylor, the Court denies Plaintiff's ex parte application.

2    **C.**    Defendants' Motion for Summary Judgment

3         The Court shall grant a motion for summary judgment "if the movant shows that there is

4    no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

5    law." Fed. R. Civ. Proc. 56(a).  An issue of fact is genuine only if there is sufficient evidence for a

6    reasonable jury to find for the nonmoving party.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S.

7    242, 248-49 (1986).  "The mere existence of a scintilla of evidence in support of the [non-moving

8    party]'s position will be insufficient; there must be evidence on which the jury could reasonably

9    find for the [non-moving party]." *Id.* at 252.  At the same time, "all reasonable inferences must be

10   drawn in favor of the non-movant."  *John v. City of El Monte*, 515 F.3d 936, 941 (9th Cir. 2008).

11        The moving party bears the burden of demonstrating the absence of a genuine issue of

12   material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Where the non-moving party

13   has the ultimate burden of proof, the moving party may prevail on a motion for summary

14   judgment by pointing to the non-moving party's failure "to make a showing sufficient to establish

15   the existence of an element essential to that party's case." *Id.* at 322.

16        **1.**    Section 1983 Violations of the First and Fourteenth Amendment

17             **a.**    Deprivation of Due Process

18        Plaintiff alleges that Defendants failed to provide her with a liberty interest hearing after

19   accusing her of sexual orientation harassment, and that Defendants failed to provide Plaintiff with

20   an unbiased pre-termination hearing.  Compl. ¶ 35.  "To obtain relief on § 1983 claims based upon

21   procedural due process, the plaintiff must establish the existence of (1) a liberty or property

22   interest protected by the Constitution; (2) a deprivation of the interest by the government; and (3)

23   lack of process." *Gutay Christian Fellowship v. Cnty. of San Diego*, 670 F.3d 957, 983 (9th Cir.

24   2011).  Here, the parties dispute whether a liberty interest exists as a result of Defendants accusing

25   Plaintiff of sexual orientation harassment, and whether there was adequate due process related to

26

27

28                                                            11

1   the deprivation of Plaintiff's liberty and property[5] interests.  Mot. at 9-10; Opp. at 26-27.

2                              i.      Liberty Interest

3          In the context of employment termination, a liberty interest is implicated "if the charge

4   impairs a reputation for honesty or morality."  *Matthews v. Harney Cnty.*, 819 F.2d 889, 892 (9th

5   Cir. 1987).  However, "injury to reputation standing alone does not violate the Due Process Clause

6   of the Fourteenth Amendment; one's 'interest in reputation' standing alone is neither 'liberty' nor

7   'property' guaranteed against state deprivation without due process of law.'  *Wenger v. Monroe*,

8   282 F.3d 1068, 1074 (9th Cir. 2002) (citation omitted).  Instead, the plaintiff must be "subjected to

9   'stigma plus'; i.e., if the state makes a charge against a plaintiff that might seriously damage his

10  standing and associations in the community . . . ."  *Id.* (citation omitted).  Thus, due process

11  protections apply if "the accuracy of the charge is contested, *there is some public disclosure of the*

12  *charge*, and it is made in connection with the termination of employment or the alteration of some

13  right or status recognized by state law."  *Jones v. Los Angeles Cmty. Coll. Dist.*, 702 F.2d 203, 206

14  (9th Cir. 1986) (citation omitted).

15         Plaintiff argues that publication exists because the stigmatizing information (*i.e.*, that

16  Plaintiff was terminated for sexual orientation harassment) was placed in her official personnel

17  file, which is subject to review when she applies for positions at other law agencies.  Opp. at 26.

18  In support, Plaintiff cites *Cox v. Spokane County*, in which the Ninth Circuit found that

19  publication of stigmatizing information occurred when the termination letter was placed in the

20  plaintiff's personnel file.  359 F.3d 1105, 1110 (9th Cir. 2004).  However, the Ninth Circuit's

21  decision was grounded in the "critical fact" that "once the stigmatizing information was placed

22  into [the plaintiff's] personnel file, it became a *public record* under Washington law, mandating

23  disclosure upon request."  *Id.*  The termination letter, which articulated two reasons for

24  terminating the plaintiff's employment - failure to meet his responsibilities and poor managerial

25  judgment - was in fact disclosed to a local newspaper who filed a public records request, as

26  _____

27  [5] There is no dispute that Plaintiff had a property interest in her continued employment.  Mot. at
    10.

28                                          12

United States District Court
For the Northern District of California

1    Washington law mandated release.  *Id.* at 1109.

2          Defendants argue that *Cox* is distinguishable because the California Public Records Act

3    (CPRA) does not require disclosure of "personnel, medical, or similar files, the disclosure of

4    which would constitute an unwarranted invasion of personal privacy."  Cal. Gov. Code § 6254(c).

5    Under California law, "[a]ll public records are subject to disclosure unless the Act expressly

6    provides otherwise."  *BRV, Inc. v. Superior Court*, 143 Cal. App. 4th 742, 751 (2006).  However,

7    the CPRA does not prohibit all disclosures of personnel files.  First, the court must "determine

8    whether disclosure of the information would compromise substantial privacy interests; if privacy

9    interests in given information are *de minimis*[,] disclosure would not amount to a 'clearly

10   unwarranted invasion of personal privacy . . . ."  *Id.* at 755 (citation omitted).  Second, the court

11   "must determine whether the potential harm to privacy interests from disclosure outweighs the

12   public interest in disclosure."  *Id.* (citation omitted).

13         In *BRV, Inc.*, the publisher of a local newspaper made a CPRA request for a report which

14   contained the findings of an investigation of complaints that the school district's superintendent

15   and high school principal, Robert Morris, had verbally abused students and sexually harassed

16   female students.  *Id.* at 747, 749.  The school district would not produce the report, claiming that it

17   was exempt from disclosure under the CPRA.  *Id.* at 749.  In its analysis, the California Court of

18   Appeal found that while "[p]ublic employees have a legally protected interest in their personnel

19   files," Morris "had a significantly reduced expectation of privacy" because he was a public

20   official.  *Id.* at 756, 759.  This expectation of privacy was then weighed against the public's

21   interest in viewing the report, which was especially high given that the public was "greatly

22   concerned about the behavior of the city's only high school superintendent and his governing

23   board in responding to their complaints," and that there were allegations that the school district

24   had "entered into a 'sweetheart deal' to buy out the superintendent from his employment without

25   having to respond to the public accusations of misconduct."  *Id.*  Thus, given "Morris's position of

26   authority as a public official and the public nature of the allegations, the public's interest in

27   disclosure outweighed Morris's interest in preventing disclosure of the . . . report."  *Id.*

28
                                              13

In contrast, the Court of Appeal found that the CPRA's exemption for personnel files applied where the plaintiff requested that a community college district disclose the personal performance goals of its former superintendent. *Versaci v. Superior Court*, 127 Cal. App. 4th 805, 810 (2005). The Court of Appeal concluded that disclosure of the personal performance goals would "compromise substantial privacy interests," and that there was limited public interest in [the superintendent's] performance because she had already retired. *Id.* at 819-20. Thus, disclosure was not warranted. *Id.* at 822.

Here, the placement of the termination letter in Plaintiff's personnel file does not constitute public disclosure of stigmatizing information. Unlike *Cox*, a personnel file does not automatically become a public record under the CPRA, "mandating disclosure upon request." *See Cox*, 359 F.3d at 1110. Instead, the CPRA generally exempts personnel files from disclosure, and requires that the privacy interest of the public employee be outweighed by the public interest in disclosure. *See BRV, Inc.*, 143 Cal. App. 4th. at 755. Plaintiff is not a public official, and has a significantly higher expectation of privacy. Unlike *BRV, Inc.*, there is no evidence that her termination and the events leading to her termination are a matter of great public concern, limiting public interest in disclosure of her personnel file. It is therefore likely that Plaintiff's privacy interest would outweigh the public interest in disclosure, and the termination letter in Plaintiff's personnel file would not be disclosed as a public record under the CPRA.

Furthermore, Plaintiff presents no evidence that Defendants otherwise publicly disclosed the termination letter or any other stigmatizing information prior to the filing of this action. *See* Flanagan Dep. at 245:21-24. Therefore, there is no constitutionally protected liberty interest, and the Court grants summary judgment in favor of Defendants on Plaintiff's Section 1983 due process claim with respect to a liberty interest.

ii.     Pre-Termination Hearing Requirements

"Due process demands that one be given an opportunity to be heard at a meaningful time and in a meaningful manner." *Jones*, 702 F.2d at 206. In determining whether a defendant's procedure comported with due process, courts have considered the three factors articulated in

United States District Court
For the Northern District of California

*Mathews v. Eldridge*: (1) the private interest affected by the official action; (2) the risk of an erroneous deprivation of that interest through the procedures used; and (3) the fiscal and administrative burdens entailed by additional procedural requirements. *Vanelli v. Reynolds Sch. Dist.*, 667 F.2d 773, 778-79 (9th Cir. 1982).

Plaintiff argues that she was denied due process with respect to her property interest (which exists even if there is no cognizable liberty interests) because the Skelly hearing was heard by Chief Magnus, who was allegedly biased against her because of her February 2013 complaint against him.[6]  Opp. at 27.  In general, "[a] biased proceeding is not a procedurally adequate one. At a minimum, Due Process requires a hearing before an impartial tribunal." *Clements v. Airport Auth. of Washoe Cnty.*, 69 F.3d 321, 333 (9th Cir. 1995).  However, the Ninth Circuit has also found that while due process requires that a hearing take place before termination, "the failure to provide an impartial decisionmaker at the pretermination stage, of itself, does not create liability, so long as the decisionmaker at the post-termination hearing is impartial." *Walker v. City of Berkeley*, 951 F.2d 182, 183 (9th Cir. 1991).  The pre-termination hearing "need not be elaborate," as it "serves only as an initial check against mistaken decisions - essentially a determination of whether there are reasonable grounds to believe that the charges are true and support the proposed action.  To that end, a plaintiff need only be accorded 'oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story." *Brewster v. Bd. of Educ.*, 149 F.3d 971, 985 (9th Cir. 1998) (citation omitted).

---

[6] Plaintiff also argues that pursuant to *Vanelli*, she was entitled to a hearing immediately after being accused of misconduct on May 9, 2013, and that the Skelly hearing took place five months later.  As discussed above, Plaintiff has not established that she had a protected liberty interest because she has not shown that there was public disclosure of the stigmatizing information. Furthermore, *Vanelli* does not stand for Plaintiff's proposition that a hearing is required immediately after allegations of misconduct.  In *Vanelli*, the plaintiff was deprived of the opportunity to appear before the school board *prior* to his termination.  667 F.2d at 776.  The Ninth Circuit found that "a pre-termination hearing is constitutionally required" as "[t]he risk of an erroneous deprivation was substantial, since appellant was dismissed without an opportunity to confront the evidence and was denied the opportunity to respond to the charges at the school board meeting."  *Id.* at 779.  In requiring a pre-termination hearing, the *Vanelli* court did not require that the hearing take place *immediately* after the accusation of misconduct.

United States District Court
For the Northern District of California

Applying *Walker* and *Brewster*, the district court in *Zografos v. City & County of San Francisco* found that the defendants complied with procedural due process requirements. Case No. C-05-3881 PJH, 2006 U.S. Dist. LEXIS 90101 (N.D. Cal. Dec. 13, 2006). There, the plaintiff lodged a number of complaints, including a complaint to Cal/OSHA regarding safety issues. *Id.* at *5. The plaintiff alleged that his filing of the complaint was known by management employees Kenneth Sapp and Don Gee. *Id.* at *6. Following a physical altercation with a co-worker, Gee and Sapp investigated the incident. *Id.* at *13. Gee then recommended that both the plaintiff and co-worker be terminated. *Id.* At the pre-termination Skelly hearing, Sapp and Gee were both present. *Id.* at *14. The plaintiff was represented, and had an opportunity to respond to questions. *Id.* at *14-15. After the hearing, Gee recommended termination, having found that the plaintiff fought on MUNI property and caused false statements to be entered into the investigation. *Id.* at *16. Following his termination, the plaintiff was offered the opportunity to appeal his dismissal with a hearing officer. *Id.* Although the plaintiff initially wished to appeal, he withdrew the appeal the day before the hearing was set, contending that he felt that the "hearing would not be fair." *Id.* at *16-17.

In court, the plaintiff argued that he was denied a meaningful pre-termination hearing because the investigator and hearing officer were biased, pointing to a formal complaint that the plaintiff had filed against Sapp. *Id.* at *25. However, the district court granted summary judgment for the defendants, finding that the plaintiff "received the requisite procedural due process at the pre-termination hearing required by Ninth Circuit law. He received notice of the hearing, an explanation of [the defendants'] evidence, and an opportunity to present his side of the story. That is all that Ninth Circuit law required." *Id.* at *28. Pursuant to *Walker*, the district court concluded that "even if the pre-termination hearing officer is not impartial, no liability attaches as long as the post-termination appeals adjudicator is impartial." *Id.* at *29. As the plaintiff "was afforded the opportunity for a post-termination hearing before an impartial judge . . . but waived it," there was no due process violation. *Id.* at *29-30; *see also Dobbertin v. Town of Patagonia*, No. CV 12-744-TUC-CRP, 2014 U.S. Dist. LEXIS 50420 at *33 (D. Ariz. Apr. 11,

16

United States District Court
For the Northern District of California

2014) (finding no deprivation of due process where the plaintiff claimed that the pre-termination adjudicators were biased because the plaintiff alleged no bias on the part of the post-termination hearing's officer).

In the instant case, Plaintiff was given adequate due process.  Plaintiff received her Skelly Notice on October 9, 2013, informing her of the three specific grounds supporting City's proposal to terminate her employment.  Flanagan Dep., Exh. V at 3-8.  The Skelly Notice also identified Plaintiff's past disciplinary problems, including disciplinary actions in September 2004, January 2005, December 2011, and October 2012.  *Id.* at 7.  Plaintiff received the supporting evidence, as she acknowledges that she received a CD with the Investigative Report and all recorded interviews, and that she read the Investigative Report before the Skelly hearing.  Flanagan Dep. at 191:5-192:2.  Regarding the Skelly hearing, while Plaintiff has stated that she felt like Chief Magnus had already made up his mind, she also admits that nobody in the meeting ever told her to stop talking or that they did not want to hear what she had to say.  Flanagan Dep. at 168:25-169:2.  Thus, as in *Zografos*, Plaintiff appears to have been granted the requisite procedural due process required by the Ninth Circuit at the pre-termination stage.  See *Walker*, 951 F.2d at 183; *Brewster*, 149 F.3d at 985.

Plaintiff contends that there is no indication that *Walker* was meant to apply to situations where the Skelly hearing officer has a conflict of interest due to an employee's workplace complaint.  Opp. at 27.  However, *Zografos* concerned a similar situation, as the plaintiff there had both previously testified against and filed a formal complaint against one of the Skelly hearing officers.  See 2006 U.S. Dist. LEXIS 90101, at *25.  This fact did not impact the conclusion that summary judgment was warranted where the plaintiff was afforded a post-termination appeal with an unbiased adjudicator.  *Id.* at *29.  Here, even assuming Chief Magnus was biased against her, Plaintiff was afforded post-termination procedures that would have given her the opportunity to present her case before an impartial hearing officer.  Plaintiff did in fact select binding arbitration, and a neutral arbitrator was selected.  Stephenson Dec. at Exh. G.  However, Plaintiff then decided not to go to arbitration, but to instead file the instant action.  *Id.* at Exh. I.  As in *Zografos*,

17

Plaintiff's decision to forgo post-termination proceedings before an impartial decision-maker should not defeat the instant motion for summary judgment, especially where Plaintiff does not allege that the post-termination proceedings would have been biased.  *Contrast with Zografos*, 2006 U.S. Dist. LEXIS 90101, at *16-17, 29-30; see also *Correa v. Nampa School Dist.*, 645 F.2d 814, 817 (9th Cir. 1981) ("where adequate administrative procedures exist, a person cannot state a claim for denial of procedural rights when he has elected to forego a complete hearing").

Because the pre-termination hearing comports with the Ninth Circuit's requirements in *Brewster*, and Plaintiff had the opportunity to have post-termination procedures before an impartial hearing officer, the Court grants summary judgment to Defendants on the entirety of Plaintiff's due process claims.

b.    First Amendment Retaliation

Plaintiff alleges that Defendants violated her First Amendment rights by retaliating against her for: (1) her February 2013 complaint alleging departmental corruption, (2) her December 2012 and May 2013 complaints against Lieutenant Curran and Records Supervisor Schlemmer for "disparate treatment," and (3) her personal religious views that she expressed outside the workplace regarding Christianity and gay marriage.  Opp. at 20.

As articulated by the Ninth Circuit, a First Amendment retaliation claim involves a five-step analysis:

> (1) whether the plaintiff spoke on a matter of public concern; (2) whether the plaintiff spoke as a private citizen or public employee; (3) whether the plaintiff's protected speech was a substantial or motivating factor in the adverse employment action; (4) whether the state had an adequate justification for treating the employee differently from other members of the general public; and (5) whether the state would have taken the adverse employment action even absent the protected speech.

*Eng. v. Cooley*, 552 F.3d 1062, 1070.

The Court finds that in the instant case, there was no speech involving a public concern.  Whether speech involves a public concern "is purely a question of law."  *Id.* at 1071.  "Speech involves a matter of public concern when it can fairly be considered to relate to any matter of

18

political, social, or other concern to the community." *Id.* at 1070 (citations omitted). For example, "[s]peech that concerns issues about which information is needed or appropriate to enable the members of society to make informed decisions about the operation of their government merits the highest degree of first amendment protection." *Coszalter v. City of Salem*, 320 F.3d 968, 973 (9th Cir. 2003) (citation omitted). In contrast, "speech that deals with individual personnel disputes and grievances and that would be of no relevance to the public's evaluation of the performance of governmental agencies is generally not of 'public concern.'" *Id.* (citation omitted). The determination of whether the speech in question is of public concern must "be made with reference to the content, form, and context of the speech." *Id.* at 973-74 (citation omitted).

In *Desrochers v. City of San Bernardino*, the Ninth Circuit found no protected speech. 572 F.3d 703, 711-12 (9th Cir. 2009). There, four sergeants, including the plaintiffs, filed an informal grievance against their supervisor Lieutenant Kimball, concerned that the interaction between themselves and Lieutenant Kimball was impacting operational efficiency. *Id.* at 705-06. Lieutenant Kimball was transferred, and a new supervisor was put in place. *Id.* at 706. Believing that the police department had not taken adequate steps to resolve their concerns, the plaintiffs filed a formal grievance against Lieutenant Kimball, Chief of Police Bildt, and Captain Mankin. The plaintiffs alleged that Lieutenant Kimball had created a "hostile work environment," and that Chief Bildt and Captain Mankin were "perpetuating this environment by 'fail[ing] to take appropriate action." *Id.*

The Ninth Circuit analyzed the content of the speech, which is "the greatest single factor." *Id.* at 710. Although the plaintiffs characterized their grievances as implicating issues such as competency, preparedness, efficiency, and morale, the Ninth Circuit was not persuaded. Instead, it noted that it had "never held that a simple reference to government functioning automatically qualifies as speech on a matter of public concern. To the contrary . . . the fact that speech contains passing references to public safety, incidental to the message conveyed weighs against a finding of public concern." *Id.* at 711 (citation omitted). In short, "[t]he reality that poor interpersonal

19

United States District Court
For the Northern District of California

relationships amongst coworkers might hamper the work of a government office does not

automatically transform speech on such issues into speech on a matter of public concern." *Id.*

Here, Plaintiff points to four speech of public concern: her December 2012 complaint of

disparate treatment by Lieutenant Curran, her February 2013 complaint of corruption under Chief

Magnus, her May 2013 complaint of disparate treatment by Records Supervisor Schlemmer, and

her religious views regarding Christianity and gay marriage.  Opp. at 20.

First, the Court finds that Plaintiff's December 2012 complaint against Lieutenant Curran

does not involve a public concern.  Plaintiff's complaint was on an internal personnel matter,

concerning an incident where Lieutenant Curran called Plaintiff at home and yelled at her for

leaving a shift early.  Flanagan Dec., Exh. F.  While Plaintiff asked "Why the disparity?", there is

no indication that she is complaining of disparate treatment based on a protected class.  Instead,

the complaint went on to note that Lieutenant Curran's behavior "go[es] hand in hand with the

former confusion and havoc that has been in our Records section."  *Id.*  Thus, the complaint is

grounded in an internal dispute, and is not on a matter of public concern.

Second, Plaintiff's February 2013 complaint was also a workplace grievance, focused

primarily on Plaintiff's concerns of "coming back into the enemy's camp," where "there has been

so much opposition, so much discord, unfairness and corruption in this department."  Flanagan

Dec., Exh. G.  Plaintiff's comments about Chief Magnus were limited to saying that she had "no

faith in our chief's ability to be right and fair."  Plaintiff does not cite to any specific incidents of

corruption in her complaint, or how Chief Magnus is responsible for the corruption.  Again, the

complaint was focused on internal management, rather than a breach of public trust that would be

a matter of public concern.  This complaint is also not on a matter of public concern.

Third, Plaintiff's May 2013 complaint against Records Supervisor Schlemmer was

likewise a workplace grievance.  While Plaintiff mentioned racial bias twice in the three-page e-

mail, her focus was primarily on the investigation into the April 18, 2013 incident with Ms.

Taylor, which she alleged was a "vicious and malicious prosecution."  Flanagan Dec., Exh. H.

Plaintiff's e-mail complaint almost exclusively focused on being put on administrative leave

20

United States District Court
For the Northern District of California

1    without due process, specifically the opportunity to present her side of the story, and arguing that

2    the investigation has involved "question[ing] people who clearly have had animosity against me

3    and a motive to lie." *Id.* Looked at as a whole, the May 2013 complaint does not appear to be a

4    complaint about racial discrimination, but was a complaint that the investigation into the April 18,

5    2013 incident was even occurring, and how it was being conducted. Thus, the Court finds that this

6    complaint is also not on a matter of public concern.

7        Finally, Plaintiff asserts that her speech regarding Christianity and gay marriage is a matter

8    of public concern. Plaintiff cites no case law in support of this proposition. Plaintiff's citation to

9    *Muhammad v. New York City Transit Authority* is unavailing; *Muhammad* did not concern speech

10   on a public concern but religious discrimination. Plaintiff's personal views about Christianity and

11   gay marriage are not a matter of public concern.

12       Having found that there was no speech on a public concern, the Court grants summary

13   judgment to Defendants on Plaintiff's First Amendment Retaliation claim.[7]

14                    c.    Free Exercise Clause

15       The Free Exercise Clause states: "Congress shall make no law respecting an establishment

16   of religion, or prohibiting the free exercise thereof." U.S. Const. amend. 1. However, the courts

17   have been clear that "[t]he right to exercise one's religion freely . . . does not relieve an individual

18   of the obligation to comply with a valid and neutral law of general applicability on the ground that

19   the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes)." *Stormans,*

20   *Inc. v. Wiesman*, 794 F.3d 1064, 1075 (9th Cir. 2015) (citations omitted).

21       With respect to her Free Exercise claim, Plaintiff alleges that Defendants terminated her

22   employment "as a direct result of her *expressing* her religious beliefs about gay marriage." Opp.

23

24   [7] Even if Plaintiff's complaints were on a matter of public concern, there are serious questions
     about whether Plaintiff had sufficient evidence to create a material question of fact as to causation.
25   Plaintiff's primary arguments that her termination was in retaliation for her complaints are that
     Defendants simply "revived" Ms. Taylor's 2012 complaints to justify an investigation and that the
26   Investigative Report found that witnesses denied Plaintiff was rude to Ms. Taylor. As is more
     fully explained in Part III.C.2.c, Plaintiff presented no evidence that Ms. Taylor did not in fact
27   complain about the April 18, 2013 incident, and Plaintiff herself admitted to being rude to Ms.
     Taylor during the investigation. *See* Investigative Report at 13, 14; Curran Dep. at 82:2-6.

28                                          21

**United States District Court**
For the Northern District of California

at 18 (emphasis added).  In general, the First Amendment "embraces two concepts, -- freedom to believe and freedom to act."  *Cantwell v. Conn.*, 310 U.S. 296, 301 (1940).  But while "[t]he first is absolute . . . the second cannot be.  Conduct remains subject to regulation for the protection of society."  *Id.* at 301-02.

While not directly on point, *Good News Employee Association v. City of Oakland* is instructive.  No. C-03-3542 VRW, 2004 U.S. Dist. LEXIS 30371 (N.D. Cal. Mar. 16, 2004).  There, the plaintiffs posted a flyer entitled "Preserve Our Workplace With Integrity," and explained that their group "is a forum for people of *Faith* to express their views on the contemporary issues of the day.  With respect for the Natural Family, Marriage and Family values.  If you would like to be a part of preserving integrity in the Workplace call [the group] . . . ."  *Id.* at *3.  Following the posting, the City developed and distributed an antidiscrimination policy regarding employee conduct, pointing specifically to "flyers . . . placed in public view which contained statements of a homophobic nature and were determined to promote sexual orientation based harassment."  *Id.* at *5.

The plaintiffs challenged the policy as a violation of the First Amendment's free speech clause and free exercise clause, among other claims.  *Id.* at *6.  In analyzing the free speech claim and whether defendants had an interest in restricting discriminatory speech about homosexuals, the district court agreed with the plaintiffs that "the flyer is not outwardly discriminatory enough to cause likely disruption in the workplace."  *Id.* at *38.  While the flyer "implicated" the issue of homosexuality, using terms such as "natural family" and "family" values, it at most "indicat[ed] disagreement with the message promoted by homosexual groups. . . . The flyer's indirect implication of disapproval of homosexuality simply is not the kind of blatant or offensive speech that on its face would cause disorder or controversy."  *Id.* at *39.  The district court contrasted the flyer to cases where the courts had found that employee speech about homosexuality could be restricted, including a Seventh Circuit case *Greer* where the plaintiff had disparaged the fire chief based on her alleged sexual orientation, using speech that was "outwardly offensive, disrespectful and likely to create public controversy."  *Id.* at *39-40 (citing *Greer v. Amesqua*, 212 F.3d 358

22

1  (7th Cir. 2000) (abrogated on other grounds)).  The district court also contrasted the flyer to

2  *Lumpkin v. Brown*, in which the Ninth Circuit affirmed summary judgment to the defendants

3  where a Human Rights Commissioner was removed for calling the homosexual lifestyle "an

4  abomination against God" and implicitly endorsing violence against homosexuals.  *See* 109 F.3d

5  1498, 1499-1500 (9th Cir. 1997).  In contrast to such inflammatory speech which directly

6  condemned homosexuality, the district court found that the plaintiffs' flyer used "no openly

7  derogatory terms about homosexuals and have not specifically targeted particular individuals."

8  *Good News Emp. Ass'n*, 2004 U.S. Dist. LEXIS 30371 at *40-41.  Thus, with respect to the flyer,

9  there was no evidence "that the flyer is so patently offensive that it would cause disruption in the

10  workplace," and the district court denied the motion to dismiss the free speech claim.  *Id.* at *41-

11  42.

12         However, the district court did grant the motion to dismiss the free exercise claim, finding

13  that the "[p]laintiffs do not allege that defendants interfered with their religious beliefs per se, but

14  rather that defendants interfered with their ability to *express* their religious beliefs.  [Citation.]

15  Without more facts that would establish how interference with expression unduly burdens their

16  religious beliefs, plaintiffs' claim is insufficient as stated."  *Id.* at *50.

17         At issue here is Plaintiff's expression of her religious beliefs about gay marriage.  During

18  the investigation, several people reported that Plaintiff made disparaging remarks about

19  homosexuals, including stating that Ms. Taylor would not go to heaven "because God does not

20  like gays," that PRS Aberson's mother would "go to hell" if she continued her relationship with

21  another woman, and asking if Ms. Taylor used the men's or women's bathroom.  Investigative

22  Report at 8, 11.  These statements were not simply expressions of disagreement with

23  homosexuality, but were inflammatory and condemning of specific individuals like Ms. Taylor

24  and PRS Aberson's mother.  Thus, these comments were comparable to speech on which the

25  courts have permitted restrictions.

26         Furthermore, as in *Good News*, there is no evidence that Defendants have

27  unconstitutionally *interfered* with Plaintiff's religious beliefs.  Plaintiff in fact alleges that

28

United States District Court
For the Northern District of California

1   Defendants terminated her employment "as a direct result of her *expressing* her religious beliefs

2   about gay marriage," and does not explain how interference with this expression would unduly

3   burden her religious beliefs.  *See* Opp. at 18 (emphasis added).  Based on the evidence in the

4   record, the termination of Plaintiff's employment was based not on her religious beliefs, but on

5   whether her inflammatory comments about homosexual lifestyles was a violation of the Richmond

6   Police Department's policies, including Policy 340.3.3(a), which prohibits "[d]iscriminating

7   against any person because of age, race, color, creed, religion, sex, **sexual orientation**, national

8   origin, ancestry, marital status, physical or mental disability or medical condition."  Flanagan

9   Dep., Exh. V at 3 (quoting Policy 340.3.3(a)) (bold in original).  As in *Good News*, this policy as

10  restricting her *expression* of beliefs does not hinder her religious beliefs.  The Court finds that

11  summary judgment on Plaintiff's free exercise claim in favor of Defendant is appropriate.[8]

12          d.      *Monell* Liability

13          With respect to Plaintiff's Section 1983 claim, summary judgment to the City of Richmond

14  is also granted on the separate ground that Plaintiff has failed to establish municipal liability, as

15  she has not identified a policy or practice that caused her constitutional deprivation.  "A

16  government entity may not be held liable under 42 U.S.C. § 1983, unless a policy, practice, or

17  custom of the entity can be shown to be a moving force behind a violation of constitutional

18  rights."  *Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011) (citing *Monell v. Dep't of*

19  *Soc. Servs. of the City of New York*, 436 U.S. 658, 694 (1978)).  Municipal liability can be

20  established in three ways:

21                  First, the plaintiff may prove that a city employee committed the
22                  alleged constitutional violation pursuant to a formal governmental
                    policy or a longstanding practice or custom which constitutes the
23                  standard operating procedure of the local governmental entity.
                    Second, the plaintiff may establish that the individual who

24

25  [8] Plaintiff's reliance on *Fraternal Order of Police Newark Lodge No. 12 v. City of Newark* is
    incorrect.  *Fraternal Order* concerned a policy that permitted officers to wear beards for medical
26  reasons, but not religious beliefs.  170 F.3d 359, 360 (3d Cir. 1999).  The Third Circuit applied
    strict scrutiny analysis to find that there was no legitimate interest in allowing officers to wear
27  beards for medical reasons, but not religious reasons.  The case had nothing to do with expression
    of religious beliefs about gay marriage, as Plaintiff implies.  Opp. at 18.

28                                                      24

**United States District Court**
For the Northern District of California

> committed the constitutional tort was an official with final policy-
> making authority and that the challenged action itself thus
> constituted an act of official governmental policy.  Whether a
> particular official has final policy-making authority is a question of
> state law.  Third, the plaintiff may prove that an official with final
> policy making authority ratified a subordinate's unconstitutional
> decision or action and the basis for it.

*Gillette v. Delmore*, 979 F.2d 1342, 1346-47 (9th Cir. 1992).

First, Plaintiff argues that there was a custom and practice of the Richmond Police Department to appoint Skelly officers who are the subject of an employee's workplace complaint. Opp. at 10, fn. 1.  Plaintiff provides no evidence that this is a custom and practice, which is in fact contradicted by Chief Magnus.  *See* Magnus Dep. at 20:19-21:1 (stating that Chief Magnus is usually the Skelly officer for Richmond Police Department employee Skelly hearings unless there is "a compelling reason where I felt I could not be fair; where I would be available . . . within a reasonable period of time; or where there might be some other really extenuating circumstance.") Even if this was the policy, it is unrelated to Plaintiff's claims for First Amendment retaliation and religious discrimination, and would only be the "cause" of a due process deprivation.  However, per *Walker*, as long as the post-termination hearing officer is impartial, the fact that the pre-termination hearing officer may be biased is not itself sufficient to show a due process violation. *See* 951 F.2d at 183.

Second, Plaintiff alleges in her complaint that "Plaintiff is informed and believes that Defendant City of Richmond has a custom, policy, pattern, or practice of retaliating against employees who make complaints of public concern."  Compl. at ¶ 37.  However, Plaintiff provides no evidentiary support that such a policy exists.  There is no evidence that similar dismissals had occurred, or how long such a policy of retaliation may have existed.  *Compare with Gillette*, 979 F.2d at 1349 (finding no evidence of an informal policy of disciplining or terminating employees who publicly criticized public safety operations where plaintiff failed to present evidence of similar dismissals or how long the informal policy existed).

Finally, Plaintiff does not allege in either her complaint or opposition that there was any policy or practice regarding religious discrimination.  The Court therefore finds that Plaintiff has

not established municipal liability under *Monell* as to her Section 1983 claims, and that this is a separate reason for granting summary judgment to the City of Richmond on her first cause of action.

    2.  FEHA and Title VII Discrimination

    Plaintiff's second cause of action alleges that Defendants violated the California Fair Employment and Housing Act (FEHA) and Title VII's prohibitions on discrimination on the basis of religion.  Compl. ¶ 43.  FEHA and Title VII "operate under the same guiding principles," and utilize the same three-step burden-shifting test established in *McConnell Douglas Corp. v. Green*. *Brooks v. City of San Mateo*, 229 F.3d 917, 923 (9th Cir. 2000); *see also Guz v. Bechtel National, Inc.*, 24 Cal. 4th 317, 354 (2000).

    Under the *McConnell Douglas* test, a plaintiff alleging discrimination must first establish a prima facie case of discrimination.  *Nicholson v. Hyannis Air Service*, 580 F.3d 1116, 1123. "Specifically, the plaintiff must show that (1) [s]he belongs to a protected class; (2) [s]he was qualified for the position; (3) [s]he was subject to an adverse employment action; and (4) similarly situated individuals outside [her] protected class were treated more favorably."  *Id.* (citation omitted).  At the summary judgment stage, "the requisite degree of proof necessary to establish a prima facie case for Title VII . . . is minimal and does not even need to rise to the level of a preponderance of the evidence."  *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1062 (9th Cir. 2002).  Furthermore, "the order of proof set forth in *McDonnell Douglas* does not permit [the court] to consider rebuttal evidence at the *prima facie* case stage."  *Lowe v. Monrovia*, 775 F.2d 998, 1006 (9th Cir. 1985).

    Once a plaintiff has produced evidence sufficient to establish a prima facie case, "the burden of production -- but not persuasion -- then shifts to the employer to articulate some legitimate, nondiscriminatory reason for the challenged action."  *Villiarimo*, 281 F.3d at 1062. Once the employer has done so, the third step of the *McDonnell Douglas* analysis puts the burden back on the plaintiff to show that the employer's articulated reason is "pretextual."  *Id.*  Thus, "the plaintiff has the ultimate burden of persuading the trier of fact that the employer *intentionally*

United States District Court
For the Northern District of California

1   discriminated against the plaintiff." *Los Angeles Cnty Dep't of Parks & Recreation v. Civil Serv.*

2   *Comm'n*, 8 Cal. App. 4th 273, 281 (1992) (emphasis added).

3               a.     Prima Facie Case

4        Plaintiff has established a prima facie case.  While Defendants argue that Plaintiff cannot

5   demonstrate a prima facie case because "there is an absence of evidence that Plaintiff was

6   performing her job satisfactorily at the time of termination," the issue is not whether Plaintiff's

7   performance was satisfactory, but whether she was *qualified* for the position.  *See Nicholson*, 580

8   F.3d at 1123; *Villiarimo*, 281 F.3d at 1062.  In determining qualifications, the courts are required

9   to look at objective criteria, not subjective criteria.  *See Lynn v. Regents of the Univ. of Cal.*, 656

10  F.2d 1337, 1344.  "To do otherwise would in many instances collapse the three step analysis into a

11  single initial step at which all issues would be resolved.  This would defeat the purpose underlying

12  the McDonnell Douglas process."  *Id.*

13       There is no real dispute that Plaintiff could satisfy the objective criteria of a position she

14  has held for over twenty years.  While Plaintiff had disciplinary issues, they are not related to her

15  ability to perform the duties of her position, such as entering in computer entries and citations,

16  pulling warrants, computer/data entry, and matron duties.  *See* Flanagan Dep. at 40:19-41:5.  Thus,

17  Plaintiff can demonstrate that she is qualified for her position.  As Defendants do not challenge

18  Plaintiff's ability to satisfy the other criteria of the prima facie case of discrimination, the Court

19  continues to step two of the *McDonnell Douglas* analysis.

20               b.     Legitimate, Non-Discriminatory Reason for Termination

21       Defendants have satisfied their burden to "produce" a nondiscriminatory reason, which in

22  the instant case were: (1) the discourteous and disrespectful treatment of Ms. Taylor on April 18,

23  2013, (2) inappropriate and derogatory comments in the workplace about homosexuality, and (3)

24  dishonesty during an administrative interview.  Mot. at 16.  Plaintiff's arguments on this point are

25  geared towards demonstrating that Defendants' reasons for terminating Plaintiff's employment

26  were pretextual, not that Defendants lacked a reason to begin with.  Thus, the Court finds that

27  there was a legitimate, non-discriminatory reason for termination, and moves to step three of the

28

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1    *McDonnell-Douglas* analysis.

2              c.    <u>Pretext</u>

3         "At the third step of the *McDonnell Douglas* scheme, the plaintiff must show that the

4    articulated reason is pretextual either directly by persuading the court that a discriminatory reason

5    more likely motivated the employer or indirectly by showing that the employer's proffered

6    explanation is unworthy of credence." *Nicholson*, 580 F.3d at 1126-27.  "To avoid summary

7    judgment at this step . . . the plaintiff must only demonstrate that there is a genuine dispute of

8    material fact regarding pretext.  The amount of evidence required to do so is minimal." *Id.* at

9    1127.  The reasoning is that "the ultimate question is one that can be resolved through a searching

10   inquiry -- one that is most appropriately conducted by the factfinder, upon a full record." *Id.* at

11   1128.  A plaintiff may also "rely on circumstantial evidence to show pretext, [but] such evidence

12   must be both specific and substantial."  However, "mere assertions that [an employer] had

13   discriminatory motive and intent . . . [a]re inadequate, without substantial factual evidence, to raise

14   an issue precluding summary judgment. *Steckl v. Motorola, Inc.*, 703 F.2d 392, 393 (9th Cir.

15   1983).

16        In *Nicholson*, the court found that the female pilot "met her minimal burden" that her

17   termination was the result of gender discrimination.  *Nicholson*, 580 F.3d at 1127.  The pilot

18   presented evidence that there were irregularities in the disciplinary proceedings, including a

19   "cursory" investigation and the employer actively soliciting letters of complaint about the pilot

20   from other pilots.  The pilot also presented evidence that the employer specifically wanted to

21   remove her, such as when they prohibited her from flying planes that they acknowledged she

22   could fly, as well as specific gender-related remarks.  *Id.* at 1128.  The pilot also provided

23   evidence that two male pilots who failed portions of their training were given the opportunity to

24   receive additional training to remedy their deficiencies, while she was not afforded the same

25   opportunity.  *Id.*  Taken together, the Ninth Circuit concluded that she had "introduced the

26   minimal evidence necessary to raise a genuine issue of material fact as to whether [the employer]

27   suspended her because of her sex." *Id.*

28                                              28

United States District Court

For the Northern District of California

1    In contrast, the Ninth Circuit found that there was insufficient evidence of pretext in

2  *Villiarimo*.  There, the plaintiff was a ramp supervisor who was involved in an accident that

3  resulted in damage to one of the defendant's airplanes.  281 F.3d at 1058.  Her employment was

4  terminated for a rule violation in connection with the accident, and for alleged dishonesty during

5  the investigation of the accident.  *Id.*  The plaintiff contended that those reasons were pretextual,

6  and that she was terminated because of gender discrimination.  *Id.* at 1062-63.  The Ninth Circuit

7  rejected her argument that the reasons for her termination had changed over time, as the evidence

8  showed that the employer's reasons had been consistent.  *Id.* at 1063.  The Ninth Circuit also

9  rejected the plaintiff's attacks on the credibility of three witnesses whose account of the accident

10  different from hers, holding that "[i]n judging whether Aloha's proffered justifications were

11  'false,' it is not important whether they were *objectively* false (e.g., whether Villiarimo *actually*

12  lied).  Rather, courts only require that an employer honestly believed its reason for its actions,

13  even if its reason is foolish or trivial or even baseless."  *Id.* (citation omitted).  As the plaintiff

14  failed to present evidence that the employer did not in fact "honestly believe its proffered

15  reasons," there was no evidence that the non-discriminatory reasons offered for her termination

16  were pretextual, and her gender-based discrimination claim failed.  *Id.*

17    In the instant case, Plaintiff alleges that Defendants discriminated against her on the basis

18  of her religious beliefs.  As Defendant has given a non-discriminatory reason for the termination

19  of her employment, Plaintiff "retains the ultimate burden of persuading the trier of fact that [s]he

20  has been the victim of intentional discrimination."  *USW Local 12-369 v. USW Int'l*, 728 F.3d

21  1107, 1118 (9th Cir. 2013) (citation and internal modifications omitted).  To survive summary

22  judgment, Plaintiff must show there is a genuine issue of material fact that Defendants' decision to

23  terminate her employment was the product of intentional discrimination against her religion.

24    Based on the record, there is no evidence that Plaintiff was intentionally terminated for her

25  religious beliefs, rather than Defendants' honestly-held belief that she violated the rules of

26  conduct.  Plaintiff's challenge to Defendants' asserted non-discriminatory reasons for termination

27  fail.

28                                                                29

For example, Plaintiff argues that Defendants could not have terminated her based on her failure to allow Ms. Taylor in on April 18 or her alleged rude behavior towards Ms. Taylor; she contends the Investigative Report contradicts both these allegations.  Opp. at 23 (citing Investigative Report at 4-7, 16-17).  The evidence does not support Plaintiff's characterization of the report.  Plaintiff theorizes that the investigation was itself a sham, as Ms. Taylor did not in fact complain about the April 18, 2013 incident, and that Defendants were simply reaching back to her 2012 complaint to persecute her.  Ex Parte Application at 7-8.  However, Plaintiff lacks any supporting evidence of this; the record shows that Ms. Taylor *did* complain in April 2013.  *See* Investigative Report at 13.  Lieutenant Curran further testified that she was not investigating the complaint in 2012, but "a complaint brought forward in April of 2013.  That's what spawned the investigation, not the 2012 allegation that, you know, had allegedly been dropped."  Curran Dep. at 82:2-6.  Plaintiff provides no contradictory evidence.  In any event, even if the Investigative Report's findings regarding the April 18, 2013 are in fact inaccurate, that alone would not be sufficient to support Plaintiff's claim of pretext.  If Defendants honestly *believed* the Investigative Report's findings, then pretext would not be found absent evidence that Defendants "did *not* honestly believe its proffered reasons."  *See Villiarimo*, 281 F.3d at 1063.  As for the Investigative Report itself, while it is true that Plaintiff did not deny Ms. Taylor access on April 18, 2013, that was not the issue; the issue was whether she had been discourteous and disrespectful towards Ms. Taylor.  Flanagan Dep., Exh. V at 2.  Also contrary to Plaintiff's argument, the other volunteer and PRS on duty did not affirmatively state that Plaintiff was professional during the April 18, 2013 incident.  Opp. at 23.  Instead, they stated that they did not know what was said between Ms. Taylor and Plaintiff.  *Id.* at 6, 17.  To the extent that Ms. Hernandez described the interaction as "polite and respectful," she was clearly characterizing Ms. *Taylor's* words, not Plaintiff's.  *Id.* at 17.  Importantly, during her investigative interview and the Skelly hearing with Chief Magnus, Plaintiff *admitted* that she was rude to Ms. Taylor, but justified it by saying that Ms. Taylor was "nasty" to her first.  Investigative Report at 14; Magnus Dep., Exh. 6.  Thus, the Investigative Report was supported by substantial evidence (including Plaintiff's own words).  Plaintiff has not

established evidence that Defendants did not honestly believe the report.

Plaintiff also claims that nobody ever heard homophobic comments by her, which resulted in the City interviewing former and retired employees.  However, PRS Harper and PRS Bryant both stated that they were aware of Plaintiff's disapproval of homosexuality, while PRS Aberson recalled specific homophobic comments made by Plaintiff.  *Id.* at 7, 8, 9.  Furthermore, even if Ms. Drake is a former employee, this fact alone does not undermine her statement that she heard Plaintiff make specific homophobic comments.  *Id.* at 11.  Because there were multiple witnesses who had observed such comments, Plaintiff failed to establish credible evidence that Defendants did not honestly believe the report.

As to other evidence of pretext, Plaintiff argues that similarly-situated PRSs were not disciplined for engaging in similar conduct as Plaintiff, specifically the failure to allow Ms. Taylor into the building or making disrespectful comments about homosexuality.  Opp. at 24.  The Ninth Circuit has held that "individuals are similarly situated when they have similar jobs and display similar conduct."  *Vasquez v. Cnty. of Los Angeles*, 349 F.3d 634, 641 (9th Cir. 2003).  Here, Plaintiff cannot point to similar conduct.  First, the investigation did not result from Plaintiff's failure to allow Ms. Taylor into the building.  Rather, Plaintiff was investigated for being discourteous and disrespectful towards Ms. Taylor on April 18, 2013.  Plaintiff does not point to any other PRS who had similarly been discourteous and disrespectful towards a volunteer, who were then not investigated or disciplined for their actions.

As to the inappropriate comment about homosexuality made by PRS Aberson, there are marked differences in the conduct for which Plaintiff was terminated.  According to the declaration by Officer Dedrick Riley, in early 2013, Officer Riley had mentioned to another PRS that he did not receive a promotion to the position of Sergeant, when PRS Aberson interjected loudly, "Well, I guess you didn't go into Chief Magnus's office with your pants pulled down."  Docket No. 51 (Riley Dec.) at ¶ 3.  Officer Riley took that as an apparent reference to the fact that Chief Magnus is an openly-gay man, and while he was extremely offended and filed a complaint, states that no action was ever taken against PRS Aberson.  *Id.*  In contrast, Plaintiff was

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

investigated because Ms. Taylor lodged a complaint after Plaintiff was rude to her on April 18, 2013, following prior complaints by Ms. Taylor against Plaintiff in 2012. Curran Dep. at 82:2-6; Investigative Report at 5; Milam Dec. at ¶¶ 4, 6. During the course of the investigation, it was discovered that Plaintiff had made numerous inappropriate remarks about homosexuality, in contrast to PRS Aberson's single comment. Investigative Report at 8, 11. When asked about the events, Plaintiff denied she made the remarks and claimed that the other witnesses had been untruthful, leading to Chief Magnus's concerns about "her repeated and unflinching willingness to call her colleagues dishonest." Magnus Dep., Exh. 6 at 7. Finally, the decision to terminate Plaintiff was based not only on her inappropriate comments about homosexuality, but her discourteous treatment of Ms. Taylor and dishonesty during the administrative interview. Flanagan Dep., Exh. V at 2-4. Termination was also deemed appropriate based on prior disciplinary actions, including Plaintiff's October 2012 two-day suspension, the December 2011 Internal Affairs investigation into the Santa hat incident, and January 2005 and September 2004 Letters of Reprimand. Viewed in context, PRS Aberson's conduct was very different from Plaintiff's, and thus PRS Aberson and Plaintiff were not similarly situated to lead to a reasonable inference that Defendants' articulated legitimate reason for terminating Plaintiff's employment was pretextual.

Nor has Plaintiff presented any evidence that Defendants' actions were motivated by religious discrimination. While there was an incident regarding the removal of the scripture, there is no evidence that the scripture removal was itself due to religious discrimination. Instead, the investigation found that the scripture was not seized, but that a sergeant had become concerned because the locker was left open. Magnus Dep., Exh. 4. When the sergeant looked inside, she found that it was empty except for a note taped to the door, which read: "RPD, you meant it for evil, but God meant it for good and blessed it so that I may be a blessing." Because the sergeant found the note disturbing, she reported it to Lieutenant Johnson, who asked her to bring him the note. When Plaintiff asked after the note, Lieutenant Johnson explained the situation, and returned the note. *Id.* The investigation further found that Plaintiff was not told that she could not display

United States District Court
For the Northern District of California

the note, and Plaintiff has not alleged otherwise. *Id.* at 51. Plaintiff also claims specific incidents of bias against her religion, as Lieutenant Curran admitted she believed that Plaintiff was trying to impose her religious views on the workplace. Opp. at 24. However, Lieutenant Curran's comments that Plaintiff's homophobic comments were based on Plaintiff's religion do not show a bias against Plaintiff's religious beliefs; they simply explain that Lieutenant Curran thought there was a connection between Plaintiff's expressed views and her religious beliefs. *See* Curran Dep. at 74:5-14. In any event, Lieutenant Curran also stated that before the investigation, she had no idea about Plaintiff's religious views. *Id.* at 75:6-10. That statement is not contradicted by any evidence. Thus, any alleged bias on the part of Lieutenant Curran would not have influenced the decision to conduct the investigation in the first place.

Plaintiff's argument that Chief Magnus was biased because he admitted that Plaintiff's religious beliefs were "odd" is also unavailing. Based on the record, it is clear that Chief Magnus was referring to the circumstance in which the scripture was found, specifically that it was found on an empty locker. Magnus Dep. at 54:13-21 (explaining that he had referred to the note as odd because "People don't leave notes on the outside of their lockers that are empty," and explaining that "it's an odd set of circumstances").

Taken as a whole, there is simply insufficient evidence to infer that Defendants' non-discriminatory reasons for terminating Plaintiff were pretextual, or that the termination of Plaintiff's employment was the result of religious discrimination. The Court therefore grants Defendants' motion for summary judgment with respect to Plaintiff's second cause of action.

3.   <u>FEHA and Title VII Retaliation</u>

Plaintiff's third cause of action alleges that Defendants violated FEHA's and Title VII's prohibition on retaliating for engaging in a protected activity. Compl. at ¶ 49. To state a cause of action for retaliation, the plaintiff must show: "(1) involvement in protected activity opposing an unlawful employment practice, (2) an adverse employment action, and (3) a causal link between the protected activity and the adverse action." *Freitag v. Ayers*, 468 F.3d 528, 541 (9th Cir. 2006).

To satisfy the protected activity requirement, the plaintiff must oppose conduct that

33

**United States District Court**
For the Northern District of California

constitutes discrimination under the statute.  *See Learned v. City of Bellevue*, 860 F.2d 928, 932

(9th Cir. 1988) ("the opposed conduct must fairly fall within the protection of Title VII to sustain

a claim of unlawful retaliation"); Cal. Gov. Code § 12940(h) (prohibiting retaliation because "the

person has opposed any practices forbidden under this part or because the person has filed a

complaint, testified, or assisted in any proceeding under this part).

      However, the courts have declined to find a protected activity supporting a retaliation

claim where the alleged protected activity at issue fails to state that it opposed discrimination.  *See*

*Pieszak v. Glendale Adventist Medical Center*, 112 F. Supp. 2d 970, 994 (C.D. Cal. 2000) (finding

that a complaint about harassment which did not mention "'sex', 'gender', or any incident that

would have disclosed that [the] harassment had anything to do with sex or gender bias" could not

support a retaliation claim); *Jamal v. Wilshire Mgmt. Leasing Corp.*, 320 F. Supp. 2d 1060, 1078-

79 (D. Ore. 2004) (finding no protected activity where the plaintiff's complaints did not mention

age discrimination, and that "[t]here can be no inference that she meant illegal age discrimination

when all she ever complained of was that she and anonymous other employees thought Magee was

a bad manager"); *Yanowitz v. L'Oreal USA, Inc.* 36 Cal. 4th 1028 ("Standing alone, an employee's

unarticulated belief that an employer is engaging in discrimination will not suffice to establish

protected conduct for the purposes of establishing a prima facie case of retaliation, where there is

no evidence the employer knew that the employee's opposition was based upon a reasonable belief

that the employer was engaging in discrimination.").

      Here, in Plaintiff's December 2012 complaint against Lieutenant Curran, the only

indication of disparate treatment is where Plaintiff asks "Why the disparity?"  Flanagan Dec., Exh.

F.  However, there is no indication as to what basis the disparate treatment is for, whether it is

religion, race, or a personnel dispute where some employees are favored for reasons other than a

protected class.  Even in Plaintiff's declaration, Plaintiff does not identify what kind of

discrimination she was alleging.  She only states that she felt that "Lt. Curran improperly []

singled me out for unequal treatment by calling me at home and yelling at me, in front of my

children . . . ."  Flanagan Dec. ¶ 12.  Plaintiff's December 2012 complaint did not put Defendants

on notice that she was making a complaint opposing group-based discrimination prohibited by

FEHA or Title VII, and therefore Plaintiff likely cannot make a prima facie case for retaliation.

The Court therefore grants Defendants' motion for summary judgment on this cause of action.[9]

       4.    California Constitutional Claims

      The Court finds that for the same reasons that Plaintiff's federal constitutional claims fail,

her state constitutional claims also fail.    Plaintiff alleges violations of the California

Constitution's free exercise clause (Art. I, § 4), due process protections (Art. I, § 7), and free

speech clause (Art. I, § 2).

      With respect to the free exercise clause, the Ninth Circuit has found that "[l]ike the First

Amendment Free Exercise Clause . . . the free exercise clause in Article I, section 4 of the

California Constitution protects against only governmental action that burdens religious freedom."

*Ohno v. Yasuma*, 723 F.3d 984, 992 fn. 12; *see also Vernon v. City of Los Angeles*, 27 F.3d 1385,

1392 (9th Cir. 1994) ("California case law suggests that analysis of a claim of the constitutional

right to the free exercise of religion is generally similar under both federal and state constitutional

law").  As Plaintiff cannot show that there was any governmental action burdening her religious

freedom, Plaintiff's state constitutional claims for violations of her free exercise rights likewise

fail.

---

[9] While Plaintiff did make a May 21, 2013 complaint specifically alleging racial discrimination, this complaint came after Plaintiff was placed on administrative leave on May 9, 2013, and the investigation into the April 18, 2013 incident between Plaintiff and Ms. Taylor had already commenced.  Flanagan Dep., Exh. R.  Plaintiff does not allege that her termination was in retaliation to this complaint.  Even if she did, she provides no evidence in support, and the Ninth Circuit has found that "[a] plaintiff's belief that a defendant acted from an unlawful motive, without evidence supporting that belief, is no more than speculation or unfounded accusation about whether the defendant really did act from an unlawful motive.  To be cognizable on summary judgment, evidence must be competent."  *Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1028 (9th Cir. 2001).  The Ninth Circuit found that a genuine issue of fact would have been established through the plaintiff's declaration where she quoted a vice president of the school board saying, "as long as [the plaintiff] continues to maintain legal proceedings against the District, [she] will be unable to obtain employment with the district."  *Id.*  However, the plaintiff had not mentioned it in her summary judgment papers.  *Id.*  In the instant case, Plaintiff does not even allege that anyone had told her that the investigation of the April 18, 2013 incident or her termination was because of her complaints.  Plaintiff's speculation that there is a causal link is insufficient to defeat summary judgment.

**United States District Court**
For the Northern District of California

As to the due process violations claim, the Ninth Circuit has recognized that California's due process protections are broader than its federal analogues.  *See Am. Tower Corp. v. City of San Diego*, 763 F.3d 1035, 1050 (9th Cir. 2014) ("although California has looked to the United States Supreme Court's precedents for guidance in interpreting the contours of its own due process clause and has treated the state clause's prescriptions as substantially overlapping those of the federal Constitution, California's due process protections are, at times, broader than those imposed by the Fourteenth Amendment.").  However, California appellate courts have relied upon Supreme Court decisions which "determined that in circumstances providing for a full hearing posttermination, the pretermination hearing 'should be an initial check against mistaken decisions-
-essentially, a determination of whether there are reasonable grounds to believe that the charges against the employee are true and support the proposed action.'"  *Gilbert v. City of Sunnyvale*, 130 Cal. App. 4th 1264, 1277 (2005) (quoting *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 545-46).  Specifically, "[t]he tenured public employee is entitled to oral or written notice of the charges against him, *an explanation of the employer's evidence*, and an opportunity to present his side of the story." *Id.* (citation omitted).  The California Court of Appeal thus rejected the plaintiff's argument that he was entitled to all documents identified in the notice of his disciplinary action prior to his pre-termination hearing, instead finding that the notice and other materials made available were adequate to provide an explanation of the employer's evidence.  *Id.* at 1280.  The California Court of Appeal noted that this was with the understanding that a "full and fair posttermination hearing" was also available.  *Id.*  Here, Plaintiff's Skelly hearing comports with the minimum requirements identified by *Gilbert* and *Skelly*, specifically that she received written notice of the charges, an explanation of the evidence, and an opportunity to present her side of the story.  Unlike the plaintiff in *Gilbert*, she also received the evidence itself, including the Investigative Report and a CD containing the recorded interviews, which she had the opportunity to review before the Skelly hearing.  Flanagan Dep. at 191:5-192:2.  Plaintiff also does not dispute that she had the opportunity to appeal to a full and fair post-termination hearing, whether before the Personnel Board or in binding arbitration, and she does not allege that either option was

United States District Court

For the Northern District of California

1    inadequate to protect her procedural due process rights. Thus, Plaintiff's California Constitutional

2    due process claim fails.

3          Likewise, the Ninth Circuit has recognized that California's free speech protections are

4    more protective than the First Amendment. *See Rosembaum v. City & Cnty of San Francisco*, 484

5    F.3d 1142, 1167 (9th Cir. 2007). However, the California Court of Appeals have also found that

6    although "[t]he California free speech clause is broader and more protective than the First

7    Amendment free speech clause . . . the fact that our provision is worded more expansively and has

8    been interpreted as being more protective than the First Amendment in some respects does not

9    mean that it is broader in all its applications." *Kaye v. Board of Trustees*, 179 Cal. App. 4th 48, 57

10    (2009) (citation omitted). Instead, when the California courts are called upon to "interpret a

11    provision of the California Constitution that is similar to a provision of the federal Constitution,

12    we will not depart from the United States Supreme Court's construction of the similar federal

13    provision unless we are given cogent reasons to do so." *Id.* (citation omitted). *Kaye* concerned a

14    plaintiff who alleged that he was discharged after sending a scathing e-mail criticizing his

15    superiors. *Id.* at 52. The California Court of Appeal found, and the plaintiff agreed, that his claim

16    would fail under the Supreme Court case *Garcetti v. Ceballos*, 547 U.S. 410, which held that a

17    First Amendment retaliation claim under Section 1983 required that the public employee be

18    speaking as a citizen on a matter of public concern. *Id.* at 56-57. While the plaintiff argued that

19    *Garcetti* should not apply, the Court of Appeal found no reason to depart, especially when

20    "California courts have routinely followed Supreme Court precedents in addressing public

21    employee free speech matters." *Id.* at 58; *see also Franklin v. Leland Stanford Junior Univ.*, 172

22    Cal. App. 3d 322, 342 fn. 8 ("Plaintiff has invited us to find greater protection in the California

23    constitutional free speech provisions (art. I, § 2). While this argument has prevailed in other cases,

24    we observe federal law has been leading the way for California cases involving discipline of

25    employees for free speech activities, and we see no reason to depart from its essential

26    reasonableness."). Thus, for the same reasons that Plaintiff's Section 1983 free speech retaliation

27    claim fails, so does her free speech claim under the California Constitution. The Court therefore

28

grants Defendants' motion for summary judgment on Plaintiff's California Constitutional claims.

## IV.   CONCLUSION

For the reasons stated above, the Court **GRANTS** Plaintiff's motion for leave to file excess pages, **DENIES** Plaintiff's ex parte application to defer the motion for summary judgment pursuant to Federal Rule of Civil Procedure 56(d), and **GRANTS** Defendants' motion for summary judgment.

The Clerk of the Court is instructed to enter judgment in accordance with the above and close the file in this case.

This order disposes of Docket Nos. 39, 46, and 55.

**IT IS SO ORDERED**.

Dated: October 13, 2015

_____
EDWARD M. CHEN
United States District Judge